1   PETER W. LIANIDES - State Bar #160517
    plianides@winthropcouhcot.com
2   **WINTHROP COUCHOT**
    **PROFESSIONAL CORPORATION**
3   660 Newport Center Drive, 4th Floor
    Newport Beach, CA 92660
4   Telephone: (949) 720-4100
    Facsimile: (949) 720-4111
5
    Counsel for Secured Creditor,
6   Integrated Financial Associates, Inc.

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                          **RIVERSIDE DIVISION**

11

12  In re:                              │  Case No. 6:09-bk-20542-MJ

13  Golden State Enterprises, LLC,      │  Chapter 11 Proceeding

14                                      │  **MEMORANDUM OF POINTS AND**
                                        │  **AUTHORITIES IN SUPPORT OF MOTION**
15              Debtor in Possession.   │  **FOR RELIEF FROM AUTOMATIC STAY, OR**
                                        │  **IN THE ALTERNATIVE, FOR A**
16                                      │  **DETERMINATION THAT THE DEBTOR IS A**
                                        │  **SINGLE ASSET REAL ESTATE CASE;**
17                                      │  **DECLARATIONS OF WILLIAM DYER AND**
                                        │  **PETER LIANIDES IN SUPPORT THEREOF**
18

19                                      │  DATE:  September 2, 2009
                                        │  TIME:  11:00 a.m.
20                                      │  CTRM:  302

21                                      │  [11 U.S.C. § 362(d)(1) & (2)]

22  ─────────────────────────────────

23          The Movant, Integrated Financial Associates Inc. ("Movant") hereby submits this

24  memorandum of points and authorities in support of its Motion for Relief from Automatic Stay, or

25  in the alternative, For a Determination that the Debtor is a Single Asset Real Estate Case

26  ("Motion").

27

28

# I.

## **FACTUAL BACKGROUND**

The Debtor is a "single asset real estate" case whose primary asset is seven adjacent parcels near the Palm Springs Airport and Ramon Road, which the Debtor refers to collectively as "Airport Plaza" (the "Property").[1]  The Property is 6 finished commercial pads plus a 13.2 acre super-pad; the total gross acreage is approximately 19.18 acres, or 835,480 sq. ft.  According to the Debtor, the Property is entitled, and has been graded with infrastructure (streets, curbs, gutters, utilities, etc.). However, there are no structures on the Property.  The Debtor's business plan has been to sell the Property to a developer or retailer who will build on the Property.

Pursuant to the Debtor's 341a testimony, the Debtor has no employees.  *See Lianides Declaration.*  Moreover, the Debtor has no income.  *See* Exhibit "3" - Statement of Affairs Nos. 1 & 2.  The only other asset, apart from the Property, is a bank account with Wells Fargo Bank consisting of a mere $117.58.  See Schedules A and B.

As set forth in the Schedule D, the Property is subject to three (3) deeds of trust plus outstanding property taxes since 2007.  The Schedules concede the Debtor has *no equity* in the Property.  See Ex. "3".

The Movant, Integrated Financial Associates Inc., is the major secured creditor holding the first and second deeds of trust against the Property.  The second note matured on or about October 1, 2008.  As admitted in the 341a testimony, the Debtor has been unable to sell or refinance the Property.  Accordingly, the Movant recorded a Notice of Default on January 20, 2009, and a Notice of Sale on April 20, 2009.

The Debtor filed its Chapter 11 petition on May 18, 2009, one day prior to the scheduled foreclosure sale on May 19, 2009.

Prior to the bankruptcy, the Debtor sought to negotiate a consensual foreclosure of the Property in exchange for a cap on the liability of the guarantors (the Debtor's principal, George

---

[1] See Property description in *Application Of Debtor And Debtor In Possession To Employ Levene, Neale, Bender, Rankin & Brill L.L.P., As Bankruptcy Counsel* filed on June 11, 2009 (docket no. 8).

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

1    Nicholas and his wife).  The Movant believes that the petition was filed, not for the purposes of a

2    bona fide reorganization, but rather to gain leverage with respect to negotiations on the principals'

3    guaranty.

4        At the 341a, the Debtor counsel's stated goal with respect to this case is as follows:

5            "The goal in the bankruptcy is to try to negotiate a resolution with the secured
      creditor.  So far everyone has been relatively cooperative.  If a resolution that

6            makes sense can be reached shortly, the ideal goal would be to have the case
      dismissed with the support of the creditors.  Alternatively, to move forward

7            with some sort of financing and/or sale scenario to obtain funds to deal with

8            the secured debtor [sic] or sell the property and exit bankruptcy in that
      manner."

9    See Lianides Declaration.

10       The Movant and the Debtor's principals have been unable to negotiation a resolution of

11   their guarantor obligations.  Hence, the Movant is now moving for relief from stay.

12       While counsel's stated alternative goal is to either sell or refinance the Property, the actual

13   testimony of the Debtor reveals that both of these options are illusory.  At the 341a meeting, the

14   Debtor's principal testified that:

15       (1)    The Property has been in its current state since 2000, and in the intervening nine (9)

16   years, the Debtor has been unable to sell the Property.  The last offer received for the Property was

17   in 2006, and the then-proposed purchased backed out during the due diligence period.  The Debtor

18   has been actively marketing the Property, but has failed to find a buyer.  See Lianides Declaration,

19   Audio Testimony 16:24 – 19:34, and 27:18 to 28:42.

20       (2)    Due the economy, the market with respect to the refinancing of the Property has

21   dried up, and that the Debtor can not find any financing in this market.  See Lianides Declaration,

22   Audio Testimony 24:12 to 24:47.

23       Accordingly, based upon the Debtor's own testimony, the Debtor has not and can not sell or

24   refinance the Property.  As a result, the Debtor by its own admission has no ability to reorganize.

25   As a result, the Movant is entitled to relief from the automatic stay.

26

27

28

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

II.

## MOVANT IS ENTITLED TO RELIEF FROM STAY

## FOR "CAUSE" UNDER SECTION 362(d)(1)

Section 362(d) provides that the Bankruptcy Court may grant relief from stay "for cause":

> (d) On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as
> by terminating, annulling, modifying, or conditioning such stay--
> (1) for cause, including the lack of adequate protection of an interest in property
> of such party in interest;

11 U.S.C.A. § 362(d)(1).

### A.    The Equity Cushion is Insufficient to Established Adequate Protection.

The lack of a sufficient equity cushion establishes a lack of adequate protection, and thus "cause" for relief from stay.

"[C]ase law almost uniformly concludes that: (1) an equity cushion of twenty percent (20%) or more constitutes adequate protection; (2) an equity cushion of less than eleven percent (11%) is insufficient; and (3) a range of twelve percent (12%) to twenty percent (20%) has divided the Courts."    In re Utah 7000, L.L.C., 2008 WL 2654919, 6 (Bankr.D.Utah 2008) (same); In re C.B.G. Ltd., 150 B.R. 570, 573 (Bankr.M.D.Pa. 1992); In re McKillips, 81 B.R. 454, 458 (Bankr.N.D.Ill. 1987).[2]   See also ("It is generally agreed that an equity cushion of twenty percent (20%) or more constitutes adequate protection, and an equity cushion of less than eleven percent (11%) is not sufficient with courts splitting as to whether an equity cushion between those two figures constitutes adequate protection.")

Accordingly, numerous cases establish that an equity cushion of eleven percent (11%) or less is not adequate protection. See e.g., In re Martin, 19 B.R. 496, 498 (Bankr.E.D.Pa. 1982) (equity cushion of "approximately 10 percent" not adequate); In re Gibson, 355 B.R. 807, 811

---

[2] Ninth Circuit case law is consistent with these figures.  See In re Mellor, 734 F.2d 1396 (9th Cir. 1984) (20% equity cushion constitutes adequate protection;  In re Gibson, 355 B.R. 807, 811 (Bankr.E.D.Cal. 2006) ("the court concludes that this 10% equity cushion does not adequately protect the Herzog Company's interest in the property"); In re Castle Ranch of Ramona, Inc., 3 B.R. 45 (Bankr.S.D.Cal.1980) (8.6% is insufficient).

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

1    (Bankr.E.D.Cal. 2006) ("the court concludes that this 10% equity cushion does not adequately

2    protect the Herzog Company's interest in the property"); Suntrust Bank v. Den-Mark Const., Inc.,

3    406 B.R. 683, 701 (E.D.N.C. 2009) (11% not adequate); Bank Rhode Island v. Pawtuxet Valley

4    Prescription & Surgical Center, Inc., 386 B.R. 1, 5 (D.R.I. 2008) ("the Court is unable to identify

5    any line of authority holding less than a 10% equity cushion to be sufficient as a general matter.");

6    In re Kost, 102 B.R. 829 (Bankr.D.Wyo. 1989) (11.5% is inadequate); In re Fortune Smooth (U.S.)

7    Ltd., 1993 WL 261478, 6 (Bankr.S.D.N.Y. 1993) (inadequate equity cushion where equity cushion

8    slightly in excess of 12.19%, which will decrease to less than ten percent (10%) if the taxes are not

9    paid); Ukrainian Savings & Loan Ass'n v. Trident Corp., 22 B.R. 491 (Bankr.E.D.Pa.1982) (10%

10    is inadequate); In re Liona Corp., N.V., 68 B.R. 761 (Bankr.E.D.Pa.1987) (8.9% is inadequate); In

11    re Jug End in the Berkshires, Inc., 46 B.R. 892 (Bankr.D.Mass.1985) (8.3% inadequate); In re

12    Castle Ranch of Ramona, Inc., 3 B.R. 45 (Bankr.S.D.Cal.1980) (8.6% is insufficient); In re

13    LeMay, 18 B.R. 659 (Bankr.D.Mass.1982) (7% is inadequate).

14        Here, the Debtor's Schedule A sets forth a fair market value of the property at $10 million.

15    Based upon the claims, as of August 1, 2009, set forth in the attached declaration of William Dyer,

16    there is no equity cushion protecting Movant's interest in the Property.

17        Even based upon the Debtor's Schedule D claim amounts, there is only an equity cushion

18    of less than 9%.  Specifically, the secured claims are as follows:

19

|  | **Name of Holder** | **Amount as Scheduled by Debtor** | **Amount Known to Movant** |
|---|---|---|---|
| Property Taxes: | Riverside County | $ 38,311.68 | $38,311.68 |
| 1st Deed of Trust: | Integrated Financial Associates Inc. | $ 7,750,000.00 | $8,709,062.50 |
| 2nd Deed of Trust: | Integrated Financial Associates Inc. | $ 1,390,000.00 | $1,619,610.42 |
| Total Secured Claim (equal or senior to Movant) | | **$ 9,178,311.68** | **$10,366,984.60** |
| **Equity Cushion** | | **$ 821,688.32** (less than 9%) | **$0.00** |

26        Accordingly, based upon the actual claim amounts, there is no equity cushion.  Even based

27    upon the Debtor's scheduled claim amounts, the equity cushion is less than 9%, which is

28    insufficient as a matter of law, to provide adequate protection.

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden State.DOC

**B.**    **The Equity Cushion is Eroding Due to the Debtor's Failure to Pay Property Taxes, and the Continuing Accrual of Interest and Charges on the Secured Debt.**

Even where there is a modest equity cushion, a secured creditor is not adequately protected where its equity cushion is being eroded by unpaid property taxes, and the accrual of interest and charges on the secured debt.  See e.g., In re Hamilton, 100 B.R. 385, 388 (N.D.Ill. 1989) ("where, as in this case, the debtors' equity cushion has steadily eroded and the debtors have consistently failed to make their payments for an extended period, the secured creditor does not have sufficient assurance that the value of his secured interest will continue to be protected."); In re Carson, 34 B.R. 502, 507 (D.Kan. 1983) ("an erosion of the equity cushion may negate the inherent protection of such cushion"); Ukrainian Sav. and Loan Ass'n v. Trident Corp. 22 B.R. 491, 495 (E.D.Pa. 1982) (no adequate protection where creditor's equity cushion was being eroded due to debtor's failure to pay periodic mortgage payments, taxes, and insurance premiums); In re Liona Corp., N.V., 68 B.R. 761, 768 (Bankr.E.D.Pa. 1987) (lack of adequate protection whether equity cushion eroded by real estate taxes and accrual of interest and charges on mortgages); *In re Schaller*, 27 B.R. 959 (D.W.D.Wis.1983) (the court held that a cushion of 17 to 18 percent did not offer adequate protection in and of itself where the cushion was being rapidly eroded by the daily accrual of interest on the debt); In re Development, Inc., 36 B.R. 998, 1007 (Bankr.D.Haw. 1984) ("Courts have held that, even where there is some equity in the property, when the equity cushion is being eroded by the continuous increase in the daily interest costs of the mortgage, there is no adequate protection to the mortgagee."); In re H & F Inv. Co., Ltd., 9 B.R. 548, 549 (Bankr. N.D.Ohio 1981)("whatever 'cushion' exists to protect the secured creditors is being quickly eroded by the continuing increase in daily interest costs of the mortgages and unpaid taxes, thereby giving inadequate protection to the secured creditors")[3]

---

[3] Other factors taken into consideration under Section 362(d)(1) include "the rate at which the cushion will be eroded by interest, depreciation, and other costs, whether periodic payments are to be made to prevent or mitigate the erosion of the cushion, and, if the collateral is to be liquidated, the likelihood of a reasonably prompt sale." In re Cole Bros., Inc., 1992 WL 71391, *2 (W.D.Mich. 1992); In re Liona Corp., N.V., 68 B.R. 761, 767 (Bankr.E.D.Pa.1987). Here, in addition to the erosion of the equity cushion, the Debtor has failed to make any periodic payments,

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

1   Here, the Property is raw land with only infrastructure, but not buildings or other

2   structures.  The Debtor's Statement of Affairs (items nos. 1 & 2) reflects that the Debtor earns no

3   income from the Property or from any other source.

4   The Debtor's Schedule B reflects that the only other asset, apart from the land, is a bank

5   account with Wells Fargo Bank containing $117.58.  Even the Debtor's application to employ

6   counsel states that "Currently, the Debtor has no funds on hand to fund a retainer."  Employment

7   Application, p.5, ¶ 10.

8   The Debtor has failed to pay property taxes for the tax years 2007 through the present.  The

9   Debtor's Schedule D reflects that the secured property taxes are in the amount of at least

10   $38,311.68.

11   Since the Debtor has no income and no funds, the Debtor will continue to default on its

12   senior property tax obligations as they come due, further eroding Movant's equity cushion, if any

13   exists.

14   Similarly, the first deed of trust continues to accrue interest, fees and charges at a per diem

15   rate of $2,906.25.  The second deed of trust accrues interest, fees an charges at a per diem rate of

16   $597/17.  Accordingly, any equity cushion (if it exists) is rapidly diminishing.  As a result, even

17   assuming arguendo there was a nominal equity cushion, it is being eroded and therefore there is a

18   lack of adequate protection under Section 362(d)(1).

19   **III.**

20   **HE DEBTOR LACKS EQUITY IN THE PROPERTY AND THERE IS NO EFFECTIVE**

21   **REORGANIZATION IN PROGRESS**

22   Section 362(d)(2) provides:

23   (d) On request of a party in interest and after notice and a hearing, the court shall grant
     relief from the stay provided under subsection (a) of this section, such as by terminating,

24   annulling, modifying, or conditioning such stay-- ***

25   (2) with respect to a stay of an act against property under subsection (a) of this section,
     if--

26   (A) the debtor does not have an equity in such property; and

27

28   and has no income or funds to make such payment; and the Debtor's 341a testimony admits there
     is not likelihood of a prompt sale or reorganization.

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

(B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d)(2).

### A.  The Debtor Does Not Have Any Equity in the Property.

Here, it is undisputed that the Debtor lacks any equity in the Property.  The Debtor's

Schedule A sets forth a fair market value of the property at $10 million.  Based upon either the

amounts set forth in Scheduled D or the actual secured claim balances, as of August 1, 2009, set

forth in the attached declaration of William Dyer, the Debtor has no equity in the Property:

|  | Name of Holder | Amount as Scheduled by Debtor | Amount Known to Declarant |
|---|---|---|---|
| Property Taxes: | Riverside County | $     38,311.68 | $38,311.68 |
| 1st Deed of Trust: | Integrated Financial Associates Inc. | $ 7,750,000.00 | $8,709,062.50 |
| 2nd Deed of Trust: | Integrated Financial Associates Inc. | $ 1,390,000.00 | $1,619,610.42 |
| 3rd Deed of Trust: | Equivest LLC | $ 1,200,000.00 | $1,200,000.00 |
| Total Secured Claim | | **$ 10,378,311.69** | **$11,566,984.60** |
| **Negative Equity** | | $ <378,311.69> | $<1,566,984.60> |

As a result, there is no dispute that "the debtor does not have an equity in such property"

for the purposes of Section 362(d)(2)(A).

### B.  The Debtor Has Admitted There Is No Effective Reorganization.

The Debtor's testimony at the 341a meeting concedes that there is no effective

reorganization.  At the 341a, the Debtor counsel's stated goal with respect to this case is as

follows:

> "The goal in the bankruptcy is to try to negotiate a resolution with the secured
> creditor.  So far everyone has been relatively cooperative.  If a resolution that
> makes sense can be reached shortly, the ideal goal would be to have the case
> dismissed with the support of the creditors. Alternatively, to move forward
> with some sort of financing and/or sale scenario to obtain funds to deal with
> the secured debtor [sic] or sell the property and exit bankruptcy in that
> manner."

The Movant and the Debtor's principals have been unable to negotiate a resolution of their

guarantor obligations.  As a result, there is no consensual resolution of this case.

Counsel's stated alternative goal is to either sell or refinance the Property.  However, the

actual testimony of the Debtor reveals that both of these options are illusory.

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

At the 341a meeting, the Debtor's principal testified that, the Property has been in its current state since 2000, and that in the intervening nine (9) years, the Debtor has been unable to sell the Property. The last offer received for the Property was in 2006, and that the then-proposed purchased backed out during the due diligence period.

| **341a Audio Recording 16:24 to 19:34** | |
|---|---|
| UST: | How long has the property been situated in the condition that it's in now ready to build? |
| Debtor (George Nicholas Jr.): | We had our final notice of completion on the property. I believe it was September of 2000. |
| UST: | Okay, so this property's been sitting like this for nine years? |
| Debtor: | For nine years. |
| UST: | Okay. Why if it has not been viable for nine years would it be viable now? |
| Debtor: | Well. |
| UST: | What's different? |
| Debtor: | The difference is, um, we, this property, when we developed it, was ahead of, there was about a hundred acres down the street from us at the main intersection of Gene Autry and Ramon that was non-developed, but would be considered in a retail environment an A site. This would be considered a B site. Well, when we started developing this in 2000, and getting all the infrastructuring, Lowes Home Improvement was, just came out to the West Coast, we decided to go over down the street on the corner, and when Lowes Home Improvement did that, then WalMart next year followed, went next to them, and then Home Depot when they were looking to compete with them, came over to us because we were the last site to do that. We were in escrow with Home Depot, but then across the street from Lowes and WalMart was a mitigation site that used to be the city dump years ago, in the 1940s and 50s, that the city for redevelopment got a developer to mitigate the environmental hazardous waste. So now we had another 50 acres of commercial that we were competing with which was better than ours, so it's been one of these things where it's just been a timing error, because in retail, retailers will go where the best location is, and we've had to wait for almost a hundred acres of retail to become fully developed to then move over here. Now since then we looked at other types of uses, like apartments, like condominiums, like other things so we could try to do something on this property, but, again, the best use and the city not wanting those types of residential components adjacent to an airport because of noise and complaints and such, have deterred us from getting developers who are interested in doing apartments and quote, you know, very small single-family residences on this property, which we could do back through here. They call 'em row houses. |
| UST: | Please identify it as Lot 8. |
| Debtor: | Lot 8. |
| UST: | For the record. |

| Debtor: | Lot 8. Um, the city would not allow that to happen, and so, uh, being that said, it became where we had to just continue to wait until all that property, which as of today all three of those big commercial sites with Home Depot, WalMart and Lowes have now been fully built out, and what has hit us now is the economy. |
| UST: | Okay. |
| Debtor: | So, it's been a progression over six, seven, eight years of just timing where other better properties down the street, which I can't blame them, they are rightfully a better location for the bigger boxes. |
| UST: | Okay. |

| **341a Audio Recording 22:48 to 23:49** | |
| UST: | Have you had any offers lately for the purchase of the real property? |
| Debtor: | The last offer we had was I believe in 2006, which was for just about 12 million dollars. |
| UST: | And why was that offer not accepted or was it not successful? |
| Debtor: | It was not successful due to the fact that we had Winco Foods, which is a, uh, like a Food 4 Less grocer. We had them on this property to purchase or lease a portion of Lot 8 and the front lots 5, 6 and 7 in front, and they, after being in escrow, pulled out after their due diligence period because of the economy in late '06 beginning of '07. So the escrow, which was part of Winco being the driving force for this sale, they backed out too, after Winco backed out. |
| UST: | Okay. |

The Debtor's principal further testified that, due the economy, the market with respect to the refinancing of the Property has completely dried up, and that the Debtor can not find any financing in this market.

| **341a Audio Recording 24:12 to 24:47** | |
| UST: | Have you sought any refinancing or other kinds of financing for those parcels? |
| Debtor: | Um, the two people that I've called don't have anybody that will do this right now, but they're brokers that I've know from the past. |
| UST: | Okay. |
| Debtor:: | It's just right now everybody seems to be very dried up in what they're doing and the words that I'm being told is is the valuation of what they're valuing property at is far less than what it really is worth and it's very difficult to have anybody do something right now, and that's what I'm being told. |
| UST: | Okay. |

Accordingly, based upon the Debtor's own testimony, the Debtor has not and can not sell or refinance the Property. As a result, the Debtor by its own admission has no ability to reorganize.

It is noteworthy that the Debtor also lacks the financial means to propose a Chapter 11 Plan. The "Disclosure of Compensation of Attorney For Debtor" reflects a retainer of only $1,100. See Exhibit "3". Schedule B reflects the Debtor's only bank account consist of a mere $117.58. Id.

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

1  Moreover, the Statement of Affairs, Items No. 1 & 2, reflect that the Debtor has no income.

2  Accordingly, the Debtor lacks the funds to even pay its counsel in this alleged reorganization

3  proceeding.

4       As a result, the Movant is entitled to relief from the automatic stay under Section 362(d)(2).

5                                     **IV.**

6                **MOVANT IS ENTITLED TO RELIEF FROM STAY**

7  **FOR "CAUSE" UNDER SECTION 362(d)(1), AS THE PETITION FOR FILED FOR AN**

8             **IMPROPER PURPOSE TO PROTECT THE GUARANTORS**

9       Section 362(d) provides that the Bankruptcy Court may grant relief from stay "for cause":

10            (d) On request of a party in interest and after notice and a hearing, the
              court shall grant relief from the stay provided under subsection (a) of this
11            section, such as by terminating, annulling, modifying, or conditioning
              such stay--
12                (1) **for cause** ...

13  11 U.S.C. § 362(d)(1) (emphasis added).

14       "Cause" is not defined in the Bankruptcy Code. Therefore, courts must determine "cause"

15  by examining the totality of the circumstances in each particular case.

16            Bankruptcy Code § 362(d)(1) allows relief from the automatic stay "for
              cause." Exactly what constitutes cause under § 362(d)(1) is not clearly
17            defined. It must be determined on a case by case basis in the court's
              discretion: "Because there is no clear definition of what constitutes 'cause,'
18            discretionary relief from the stay must be determined on a case by case
              basis." In re Mac Donald, 755 F.2d 715, 717 (9th Cir.1985) (citation
19            omitted).
20
21  In re Shirley, 134 B.R. 940, 943 (9th Cir. BAP 1992).

        It is well established that "cause" to lift the automatic stay includes "bad faith". See In re
22
    Duvar Apt., Inc., 205 B.R. 196, 200 (9th Cir. BAP 1996) ("The bankruptcy court granted relief
23
    from the stay for cause on the grounds that the debtor had filed for bankruptcy in bad faith")
24
        "Once the question of good faith/bad faith is put in issue, the party bringing the bankruptcy
25
    Petition has the burden of proving that the Petition was brought in good faith."   In re Hammonds,
26
    139 B.R. 535. 541 (Bankr.D.Colo. 1992); In re Leavitt, 209 B.R. 935, 940 (9th Cir. BAP 1997)
27
    ("Debtor bears the burden of proving that the petition was filed in good faith."); In re Powers, 135
28

                                     -11-

1  B.R. 980, 997 (Bankr.C.D.Cal. 1991)("once a debtor's good faith is in issue, the debtor bears the

2  burden of proving the petition was filed in good faith.").

3       In <u>In re Leavitt</u>, 171 F.3d 1219, 1224 (9th Cir. 1999), the Ninth Circuit concluded that "bad

4  faith" does <u>not</u> require a finding of fraud, malice or ill will:

5       A finding of bad faith does not require fraudulent intent by the debtor.
        Neither malice nor actual fraud is required to find a lack of good faith.  The
6       bankruptcy judge is not required to have evidence of debtor illwill directed at
        creditors, or that debtor was affirmatively attempting to violate the law-
7       malfeasance is not a prerequisite to bad faith.

8  <u>Id.</u> at 1224-1225 *quoting* <u>In re Powers</u>, 135 B.R. 980, 994 (Bankr.C.D.Cal.1991).  *See also* <u>In re</u>

9  <u>Waldron</u>, 785 F.2d 936, 941 (11th Cir. 1986) ("manifestations of bad faith need <u>not</u> be based upon

10 a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud.  We simply

11 require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to

12 condone its abuse."); <u>In re Grieshop</u>, 63 B.R. 657, 663 (N.D.Ind.1986).

13      Rather, a bankruptcy is filed in bad faith where the debtor files for an improper or

14 unworthy purpose.

15      Bad faith may be found when the debtor has a frivolous, noneconomic motive for
        filing a bankruptcy petition, when there is a sinister or unworthy purpose, or when
16      there is an abuse of the judicial process.

17 <u>Matter of Quarter Moon Livestock Co., Inc.</u>, 116 B.R. 775, 781 (Bankr.D.Idaho 1990) quoting 4

18 Collier on Bankruptcy, ¶ 707.03, 707-8-9 (15th ed. 1989); <u>In re Kempner</u>, 152 B.R. 37, 39 (D.Del.

19 1993) (same); <u>In re Shula</u>, 280 B.R. 903, 905 (Bankr.S.D.Ala 2001) (same).

20      It is well established that a bankruptcy filed for the purpose of protecting the Debtor's

21 guarantors is an improper purpose justifying the dismissal of the case.  See e.g., <u>In re North</u>

22 <u>Vermont Associates, L.P.</u>, 165 B.R. 340 (Bankr.D.D.C. 1994) (Chapter 11 debtor-limited

23 partnership's petition, which was filed for purpose of protecting guarantors of mortgage debt rather

24 than debtor, was filed in bad faith and debtor's case would be dismissed); <u>In re Woolley's Parkway</u>

25 <u>Center, Inc.</u>, 147 B.R. 996 (Bankr.M.D.Fla.1992) (plan not proposed in good faith where its sole

26 purpose was to relieve debtor's principal of guarantee obligation).

27      Here, the Debtor's case bears several indicia of bad faith:

28

1       1.     The Debtor filed its Chapter 11 petition on May 18, 2009, one day prior to the

2  scheduled foreclosure sale on May 19, 2009.

3       2.     The case is essentially a two-party dispute with few unsecured creditors.

4  Specifically, Schedule F reflects only seven (7) general unsecured creditors consisting of

5  professional & consulting fees associated with the Property and utilities.  See Ex. "3".

6       3.     The Debtor's 341a testimony effectively admits that the Debtor has no ability to

7  reorganize.  See Lianides Declaration.

8       4.     The pre-petition negotiations between the Movant and the Debtor's principal

9  primarily concerned the principals limiting their exposure on the guarantees.  Specifically, the

10  Debtor's principal a deed in lieu of foreclosure in exchange for waiving the guaranty and taking an

11  unsecured note.  The Movant and the Debtor's principal were unable to reach an agreement with

12  respect to the guarantor liability, and as a result, the Debtor's principal filed the instant Chapter 11

13  petition on the eve of the foreclosure.  Since the Debtor's 341a testimony effectively admits that

14  the Debtor has no ability to reorganize, the only logical inference is that the petition was filed for

15  the purpose of gaining leverage in the negotiations with respect to the guarantor obligations.  As

16  set forth above, this is an improper purpose for filing a Chapter 11 proceeding.

17  **V.**

18  **ALTERNATIVELY, THE MOVANT REQUESTS A FINDING THAT THE DEBTOR IS A**

19  **SINGLE ASSET REAL ESTATE CASE**

20       In the alternative, the Debtor requests a finding that the Debtor is a "single asset real

21  estate" case and therefore subject to the deadlines set forth in Section 362(d)(3).  Section 101(51B)

22  defines a "single assert real estate" case as follows:

23       (51B) The term "single asset real estate" means real property constituting a single
          property or project, other than residential real property with fewer than 4

24       residential units, which generates substantially all of the gross income of a debtor
          who is not a family farmer and on which no substantial business is being

25       conducted by a debtor other than the business of operating the real property and

26       activities incidental.

27  11 U.S.C.A. § 101(51B).

28

1      It is well established that the term single assets real estate includes undeveloped or partially

2  developed land which generates no income.  See In re Oceanside Mission Associates, 192 B.R.

3  232, 236 (Bankr.S.D.Cal.1996) (examining the Congressional intent and concluding "'single asset

4  real estate' includes undeveloped real property which generates no income"); In re Kinard, 2001

5  WL 1806039, *5 (Bankr.D.S.C. 2001) (same); In re Pensignorkay, 204 B.R. 676, 681-82

6  (Bankr.E.D.Pa.1997) ("[T]he fact that the real property is currently undeveloped and not

7  generating any income for the Debtor is of little consequence for purposes of the inquiry here,

8  since the Court is satisfied that Congress did not intend to excuse from compliance with the

9  revised statute the class of debtors who hold undeveloped tracts of land for future development.");

10  In re Syed, 238 B.R. 133, 140 (Bankr.N.D.Ill. 1999) ("the definition of 'single-asset real estate'

11  has been found to include partially developed land generating no income as well as raw land.")

12      The Debtor's Schedules reflect only two (2) assets:

13      (1)      The real property located in Palm Springs, which the Debtor refers to collectively as

14  "Airport Plaza" (the "Property").[4]

15      (2)      A bank account with Wells Fargo Bank consisting of a mere $117.58.

16      Accordingly, the Property (Airport Plaza) constitutes a single property or project, on which

17  no substantial business is being conducted by a debtor other than the business of operating the real

18  property and activities incidental.

19      The Debtor has no income.  See Exhibit "3" - Statement of Affairs Nos. 1 & 2.

20  Accordingly, the Debtor does not derive income from a source other than the Property.  As set forth

21  in the case law above, even non-income producing land falls within the definition of "single asset

22  real estate".  Pursuant to the Debtor's 341a testimony, the Debtor has no employees.  See Lianides

23  Declaration.  Accordingly, the Debtor has no business operations and no income..

24      Accordingly, the Debtor falls within the definition of a "single asset real estate" case, and

25  thus the Court should make such determination for the purposes of Section 362(d)(3).

26

27  _____

[4] See Property description in Application Of Debtor And Debtor In Possession To Employ Levene,

28  Neale, Bender, Rankin & Brill L.L.P., As Bankruptcy Counsel filed on June 11, 2009 (docket no.
8).

-14-

1

## VI.

## CONCLUSION

Wherefore, Integrated Financial Associates requests that the Court enter an order lifting the automatic stay under Section 362(d)(1) and (d)(2), or in the alterative, determining that the Debtor is a "single asset real estate" case for the purposes of Section 362(d)(3).

DATED:  August 12, 2009

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**


_/s/ Peter W. Lianides_
Peter W. Lianides, Esq.
Attorneys for Integrated Financial Associates, Inc.

-15-

## DECLARATION OF WILLIAM DYER

I, William Dyer, declare:

1. I am the CEO and President of Integrated Financial Associates, Inc. ("IFA" or "Movant"). The matters stated herein are true and correct and within my personal knowledge. If called as a witness, I could and would competently testify thereto.

2. The Debtor is the owner of certain real property consisting of seven adjacent parcels near the Palm Springs Airport and Ramon Road (the "Property"). The Property is six (6) finished commercial pads plus a 13.2 acre super-pad; the total gross acreage is approximately 19.18 acres, or 835,480 sq. ft.  The Debtor's business plan has been to sell the Property to a developer or retailer who will build on the Property.

3. I have reviewed the Debtor's Schedules in the above entitled bankruptcy proceeding. The Debtor lists unpaid property taxes of $38,311.68. These property taxes are delinquent for tax years 2007 and 2008.

4. The Debtor's schedules list the Movant, Integrated Financial Associates Inc., as the major secured creditor holding the first and second deeds of trust against the Property.

5. The first note and deed of trust has a principal balance of $7,750,000, plus accrued prepetition interest of $749,812.50 and $217,968.75 post-petition interest (as of August 1, 2009).

6. A true and correct copy of the Promissory Note Secured By Second Deed of Trust, dated September 17, 2007 ("Second Note"), is attached hereto as exhibit "2" and incorporated herein by this reference.

7. A true and correct copy of the Deed of Trust secured the Second Note is attached hereto as exhibit "2" and incorporated herein by this reference.

8. The second note matured by its own terms on or about October 1, 2008.  The Second Note is accruing per diem interest and charges of $579.17.

9. The Debtor's Schedule A sets forth a fair market value of the property at $10 million. Based upon either the amounts set forth in Scheduled D or the actual secured claim balances, as of August 1, 2009, set forth herein below, the Debtor has no equity in the Property:

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

| | Name of Holder | Amount as Scheduled by Debtor | Amount Known to Declarant |
|---|---|---|---|
| Property Taxes: | Riverside County | $ 38,311.68 | $38,311.68 |
| 1st Deed of Trust: | Integrated Financial Associates Inc. | $ 7,750,000.00 | $8,709,062.50 |
| 2nd Deed of Trust: | Integrated Financial Associates Inc. | $ 1,390,000.00 | $1,619,610.42 |
| 3rd Deed of Trust: | Equivest LLC | $ 1,200,000.00 | $1,200,000.00 |
| Total Secured Claim | | **$ 10,378,311.69** | **$11,566,984.60** |
| **Negative Equity** | | **$ <378,311.69>** | **$<1,566,984.60>** |

10.    As admitted in the 341a testimony, the Debtor was unable to sell or refinance the Property.  Accordingly, the Movant recorded a Notice of Default on January 20, 2009, and a Notice of Sale on April 20, 2009, with respect to the Second Note.

11.    The Debtor filed its Chapter 11 petition on May 18, 2009, one day prior to the scheduled foreclosure sale on May 19, 2009.

12.    Prior to the bankruptcy, the Debtor sought to negotiate a consensual foreclosure of the Property in exchange for a cap on the liability of the guarantors (the Debtor's principal, George Nicholas and his wife).  A true and correct copy of the proposed Forbearance Agreement revised and provided by the Debtor's principal in February 2009, is attached hereto as exhibit "4" and incorporated herein by this reference.  I believe that the petition was filed, not for the purposes of a bona fide reorganization, but rather to gain leverage with respect to negotiations on Nicholas' guaranty.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of August 2009, at Las Vegas, Nevada.

_____
William Dyer

## DECLARATION OF PETER W. LIANIDES

I, Peter W. Lianides, declare:

1.      I am an attorney licensed to practice law in the State of California, and a shareholder of the law firm of Winthrop Couchot, Professional Corporation, insolvency counsel to Integrated Financial Associates, Inc. ("IFA" or "Movant") with respect to the above entitled matter. The matters stated herein are true and correct and within my personal knowledge. If called as a witness, I could and would competently testify thereto.

2.      I have reviewed the Debtor's Schedules and Statement of Affairs, downloaded from PACER, a true and correct copy of which is attached hereto as exhibit "3" and incorporated herein by this reference.

3.      I attended the 341a meeting of creditors, held by the U.S. Trustee's office on June 23, 2009. I obtained an audio recording of the 341a meeting from the U.S. Trustee's office. I reviewed the audio recording, and had our office word processor transcribe certain relevant portions of the audio recording. The statements below set forth below are an accurate transcription of the 341a testimony. At the 341a, the Debtor counsel's stated goal with respect to this case is as follows:

> "The goal in the bankruptcy is to try to negotiate a resolution with the secured creditor. So far everyone has been relatively cooperative. If a resolution that makes sense can be reached shortly, the ideal goal would be to have the case dismissed with the support of the creditors. Alternatively, to move forward with some sort of financing and/or sale scenario to obtain funds to deal with the secured debtor [sic] or sell the property and exit bankruptcy in that manner."

4.      At the 341a meeting, the Debtor's principal testified that, the Property has been in its current state since 2000, and that in the intervening nine (9) years, the Debtor has been unable to sell the Property. The last offer received for the Property was in 2006, and that the then-proposed purchased backed out during the due diligence period.

| 341a Audio Recording    16:24 to 19:34 | |
|---|---|
| UST: | How long has the property been situated in the condition that it's in now ready to build? |
| Debtor (George Nicholas Jr.): | We had our final notice of completion on the property. I believe it was September of 2000. |

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

| | | |
|---|---|---|
| 1 | UST: | Okay, so this property's been sitting like this for nine years? |
| | Debtor: | For nine years. |
| 2 | UST: | Okay. Why if it has not been viable for nine years would it be viable now? |
| | Debtor: | Well. |
| 3 | UST: | What's different? |
| 4 | Debtor: | The difference is, um, we, this property, when we developed it, was ahead of, there was about a hundred acres down the street from us at the main intersection of Gene Autry and Ramon that was non-developed, but would be considered in a retail environment an A site. This would be considered a B site. Well, when we started developing this in 2000, and getting all the infrastructuring, Lowes Home Improvement was, just came out to the West Coast, we decided to go over down the street on the corner, and when Lowes Home Improvement did that, then WalMart next year followed, went next to them, and then Home Depot when they were looking to compete with them, came over to us because we were the last site to do that. We were in escrow with Home Depot, but then across the street from Lowes and WalMart was a mitigation site that used to be the city dump years ago, in the 1940s and 50s, that the city for redevelopment got a developer to mitigate the environmental hazardous waste. So now we had another 50 acres of commercial that we were competing with which was better than ours, so it's been one of these things where it's just been a timing error, because in retail, retailers will go where the best location is, and we've had to wait for almost a hundred acres of retail to become fully developed to then move over here. Now since then we looked at other types of uses, like apartments, like condominiums, like other things so we could try to do something on this property, but, again, the best use and the city not wanting those types of residential components adjacent to an airport because of noise and complaints and such, have deterred us from getting developers who are interested in doing apartments and quote, you know, very small single-family residences on this property, which we could do back through here. They call 'em row houses. |
| 19 | UST: | Please identify it as Lot 8. |
| | Debtor: | Lot 8. |
| 20 | UST: | For the record. |
| 21 | Debtor: | Lot 8. Um, the city would not allow that to happen, and so, uh, being that said, it became where we had to just continue to wait until all that property, which as of today all three of those big commercial sites with Home Depot, WalMart and Lowes have now been fully built out, and what has hit us now is the economy. |
| 23 | UST: | Okay. |
| 24 | Debtor: | So, it's been a progression over six, seven, eight years of just timing where other better properties down the street, which I can't blame them, they are rightfully a better location for the bigger boxes. |
| 26 | UST: | Okay. |
| 27 | | **341a Audio Recording    22:48 to 23:49** |
| 28 | UST: | Have you had any offers lately for the purchase of the real property? |

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

| | | |
|---|---|---|
| 1 | Debtor: | The last offer we had was I believe in 2006, which was for just about 12 million dollars. |
| 2 | UST: | And why was that offer not accepted or was it not successful? |
| 3 4 5 | Debtor: | It was not successful due to the fact that we had Winco Foods, which is a, uh, like a Food 4 Less grocer.  We had them on this property to purchase or lease a portion of Lot 8 and the front lots 5, 6 and 7 in front, and they, after being in escrow, pulled out after their due diligence period because of the economy in late '06 beginning of '07.  So the escrow, which was part of Winco being the driving force for this sale, they backed out too, after Winco backed out. |
| 6 | UST: | Okay. |

7    5.    The Debtor further testified that the Property has been actively marketed:

| | 341a Audio Recording   27:18 to 28:42 | |
|---|---|---|
| 8 9 | Movant's counsel: | What is your present intention with respect to the property now?  Are you looking to sell, to develop, what is your intention? |
| | | * * * |
| 10 11 | Debtor: | What we expressed in the beginning was that the intention is to work out something with Integrated Financial and hopefully be able to dismiss this bankruptcy proceeding prior to having to file a plan.  That's the goal. |
| 12 | Movant's counsel: | Okay.  My understanding is the last offer was in 2006, the last purchase offer. |
| 13 | Debtor: | Yes. |
| 14 | Movant's counsel: | Has there been active marketing of the property since then? |
| 15 16 | Debtor: | There has been and, um, as of this last year, we went to a new broker who has been a little bit more proactive than the ones in the past.  And, uh, both your lender, your, uh... |
| 17 | UST: | Client. |
| 18 | Debtor: | ...client and the broker have spoken on the phone so we've had a conversation of what the property has been doing, what we plan to do, or what they plan to do, and going from there. |
| 19 20 | Movant's counsel: | Okay, but, despite the marketing efforts, there hasn't been any offers? |
| 21 | Debtor: | There hasn't been any offers that are of value because of everybody is bottom-feeding right now ... |

22    6.    The Debtor's principal further testified that, the market with respect to the

23  refinancing of the Property has dried up, and that the Debtor can not find any financing in this

24  market.

25

| | 341a Audio Recording  24:12 to 24:47 | |
|---|---|---|
| 26 | UST: | Have you sought any refinancing or other kinds of financing for those parcels? |
| 27 | Debtor: | Um, the two people that I've called don't have anybody that will do this right now, but they're brokers that I've know from the past. |
| 28 | UST: | Okay. |

MAINDOCS-#132528-v1-IFA_P&As_Relief_Stay_Golden_State.DOC

| Debtor:: | It's just right now everybody seems to be very dried up in what they're doing and the words that I'm being told is is the valuation of what they're valuing property at is far less than what it really is worth and it's very difficult to have anybody do something right now, and that's what I'm being told. |
|---|---|
| UST: | Okay. |

7.    At the 341a meeting, the Debtor further testified that the Debtor has no employees.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of August 2009, at Newport Beach, California.

_/s/ Peter W. Lianides_
Peter W. Lianides

-21-